# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANET WATSON and WILLIAM WATSON, | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | NO.  10-6731 |
| | : | |
| HAVERFORD TOWNSHIP POLICE DEPARTMENT, THE TOWNSHIP OF HAVERFORD, CARMEN D. PETTINE, HARVEY PIKE, STEVEN GILL, and JOHN PILI, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

BUCKWALTER, S. J.                                             May 24, 2012

Presently before the Court are (1) the Motion by Plaintiffs Janet Watson and William Watson for Partial Summary Judgment on Count I of the Complaint Against Defendant Officers Pike and Gill, and (2) the Motion by Defendants Haverford Township, Police Department, Township of Haverford, Harvey Pike, and Steven Gill (collectively the "Haverford Defendants" or "Defendants") for Summary Judgment.  For the following reasons, Plaintiffs' Motion is granted and Defendants' Motion is granted in part and denied in part.

## I.      FACTUAL AND PROCEDURAL HISTORY[1]

The present action concerns the alleged unlawful arrest and imprisonment of Plaintiff

Janet Watson by members of the Haverford Township Police Department.  Mrs. Watson was

sixty-two years old on November 17, 2008, the date of the incident in question.  (Defs.' Mot.

Summ. J., Ex. 1, Dep. of Janet Watson ("J. Watson Dep."), 7:24–8:1, 16:9–13, Dec. 9, 2011.)

Her husband is William Watson.  (Id. at 8:20–9:1, Pls.' Statement of Undisputed Facts ("PSUF")

¶ 2.)  Frances Tornetta, Mrs. Watson's mother, lives with Plaintiffs in their home, and is

currently eighty-eight years old.  (J. Watson Dep. 10:6–17, 102:19–24.)  For the past twenty to

twenty-five years, the Watsons have resided at 54 Upland Road in Havertown, Pennsylvania.  (Id.

at 8:2–19.)  At all times relevant to this dispute, and prior to Plaintiffs occupying their Upland

Road residence, Defendant John Pili and his wife Donna resided at 50 Upland Road, next door to

Plaintiffs.  (Id. at 19:1–7.)  Mr. Pili is a Code Enforcement Officer for Haverford Township.

(PSUF ¶ 9.)

For years prior to the incident in question, the Pilis and the Watsons had a long-standing

---

[1]  In their Reply Brief, the Haverford Defendants argue that because Plaintiffs have failed
to set forth a Response in Opposition to the Statement of Undisputed Facts filed with
Defendants' Motion for Summary Judgment, all of the facts therein must be deemed admitted.
Defendants cite Walthour v. Miller, 795 F. Supp. 2d 317 (E.D. Pa. 2011) in support of this
proposition.

Notably, however, nothing in Walthour stands for this principle.  Rather, the court in that
case simply noted that the plaintiff had failed to produce any evidence to create a genuine issue
of material fact on the key disputes.  Id. at 323.  Although Plaintiffs, in the present case, did not
originally file a formal opposition to Defendants' Statement of Undisputed Facts, Plaintiffs
submitted their own Motion for Partial Summary Judgment, which included their own Statement
of Undisputed Facts with supporting evidence.  Such a Statement suffices to dispute Defendants'
proposed facts.

In any event, on May 16, 2012, Plaintiffs, via Sur-reply Brief, submitted a formal
opposition to the Statement of Facts.  As such, the Court finds no basis on which to blanketly
deem the facts pled in the Haverford Defendants' Statement to be admitted.

history of animosity between them.  (Defs.' Mot. Summ. J., Ex. 2, Documents Relating to

Neighbor Disputes.)  Shortly after the Watsons moved in, sometime in 1987, the Pilis demanded

that they remove an oak tree from their yard.  (J. Watson Dep. 23:6–24:21.)  Thereafter, the Pilis

sent anonymous letters to the Watsons complaining, among other things, that Mr. Watson's car

engine was too noisy in the morning.  (Id. at 25:2–26:8, 32:16–24:20.)  This history of disputes

between the parties continued and ranged from complaints about a tree limb from the Watson's

property encroaching on another neighbor's house (id. at 37:13–42:8), to allegedly invalid

citations issued by Mr. Pili to Mrs. Watson's mother who lived down the street at the time, (id. at

42:13–43:12), to Mr. Pili's father-in-law trespassing into the Watsons' yard to prune trees, (id. at

43:16–45:12), to the Pilis putting up surveillance cameras facing the Watsons' house with signs

saying "what goes around comes around," or "I see you 24/7."  (Id. at 45:13–46:18.)

     The events giving rise to this lawsuit occurred on November 17, 2008, when Mrs. Watson

was using a gas-powered blower to blow leaves in her yard.  (Id. at 21:6–22:7.)  According to

Mrs. Watson, she was blowing leaves into a pile, collecting them in the rear bag of her

lawnmower, and putting them in a plastic trash bag for collection.  (Id.)  There were purportedly

no leaves between her house and the Pili's house.  (Id. at 21:21–22:1.)  According to John Pili,

however, when he arrived home from work at 4:30 p.m. that day, Mrs. Watson was blowing

leaves onto his property.  (Defs.' Mot. Summ. J., Aff. of John Pili ("J. Pili Aff.") ¶ 6, Mar. 30,

2012.)  Donna Pili, Mr. Pili's wife, also observed Mrs. Watson blowing leaves and debris down

her driveway and onto her property.  (Defs.' Mot. Summ. J., Aff. of Donna Pili ("D. Pili Aff.") ¶

6, Apr. 2, 2012.)  Mrs. Watson unequivocally denied blowing any leaves onto their property.  (J.

Watson Dep. 57:7–11, 114:4–13.)  Mr. Pili allegedly asked Mrs. Watson to stop her actions, but

she did not respond.  (J. Pili Aff. ¶ 7.)  Accordingly, Mr. Pili went into the house to call the police.  (D. Pili Aff. ¶ 9.)

Haverford Police Officer Harvey Pike was the first to arrive at the scene.  He was dispatched to the location where, upon arrival, he observed Mrs. Watson actively blowing her leaves onto her neighbor's lawn.  (Pls.' Mot. Summ. J., Ex. D; Pls.' Mot. Summ. J., Ex. B, Dep. of Harvey Pike ("Pike Dep."), 9:18–10:21, 13:12–24, Feb. 24, 2012.)  Officer Pike did not know and had never met the Watsons or Pilis before this date.  (Pike Dep. 16:2–9.)  A few minutes later, another Haverford Police Officer, Defendant Steven Gill, pulled up in front of the homes, but he remained in his car doing unrelated paperwork.  (Defs.' Mot. Summ. J., Ex. 5, Dep. of Harvey Gill ("Gill Dep."), 12:19–14:2, Feb. 24, 2012.)   Officer Pike first approached Donna Pili and asked her for identification, which she produced from her house.  (D. Pili Aff. ¶¶ 12–13.)  She then explained her version of the events to Officer Pike.  (Id. ¶ 14.)  Subsequently, he went over to Mrs. Watson.  (Id. ¶ 15.)  Mrs. Watson indicated that she was "startled" to see a police officer there and she was having difficulty turning off the blower.  (J. Watson Dep. 22:8–16.)  According to Officer Pike, Mrs. Watson purposely did not turn off the leaf blower, and in fact revved the engine when Officer Pike began to try to talk to her.  (Pike Dep. 17:18–18:9.)  Officer Pike allegedly said, "You have a problem with your neighbor" to which Mrs. Watson replied, "No, we need to change that.  My neighbor must have a problem with me, or you wouldn't be here."  (Id. at 22:16–21.)  Officer Pike then asked if she drove, and when she answered that she did, he asked her to get her license.  (J. Watson Dep. 60:20–24; Pike Dep. 19:21–3.)  When Mrs. Watson questioned why the Officer wanted her license, he responded that this was an official police investigation and stated, "[I]f you don't show me your license, I'm going to arrest you."

4

(J. Watson Dep. 62:2–13; Pike Dep. 20:5–11.)  After repeatedly objecting, Mrs. Watson

eventually shut off the leaf blower, told the Officer that her license was in the house, and walked

into the house.  (J. Watson Dep. 62:23–63:9; Pike Dep, 21:5–24:5.)  He described her as

"uncooperative," "confrontational," and "argumentative."  (Id. at 25:19–27:3.)  Mrs. Watson, in

turn, described him as "aggressive."  (J. Watson Dep. 61:20–62:16.)

          After this discussion, Mrs. Watson entered her house through the back door and closed

the door behind her.  (Defs.' Mot. Summ. J., Ex. 4.)  When she got into the house, however, Mrs.

Watson called her county commissioner, Mario Olivia, because he knew of the ongoing

neighborhood dispute.  (J. Watson Dep. 64:13–17.)  She managed to get a hold of him and

explain the situation, but he simply said he would look into it.  (Id. at 64:23–65:7.)  She did not

feel that that was a satisfactory response, so she called 9-1-1.  (Id. at 65:7–21.)  In the meantime,

Officer Pike went to the back door of the Watsons' residence and knocked on the door,

announcing himself as police.  (Pike Dep. 30:14–31:9.)  While Mrs. Watson was on the phone,

Mrs. Watson's mother, Frances Tornetta, opened the door.  (Id. at 31:10–16; Pl.'s Mot. Summ.

J., Ex. E.)  He told Ms. Tornetta that he was looking for the lady who just came into the house,

and she replied that it was her daughter, invited him in, and directed him to the kitchen.  (Pike

Dep. 31:18–32:17.)  As Mrs. Watson was speaking with the 9-1-1 operator, she heard Officer

Pike tell her to hang up the phone.  (J. Watson Dep. 67:2–4.)  He again requested her for

identification, but she refused to give it to him.  (Pike Dep. 36:2–5.)  According to Officer Pike,

Mrs. Watson again walked over and picked up the phone to call 9-1-1.  (Id. at 39:19–40:24.)

Officer Pike then received a radio message asking if he was okay, to which he responded that

dispatch should send another car since he was going to arrest Mrs. Watson.  (Id. at 40:17–24.)

5

At this point, Officer Gill also received a radio message to come into the house through the rear door, which he promptly did.  (Gill Dep. 14:18–15:14.)  After Mrs. Watson again disregarded Officer Pike's orders to hang up the phone, he then took the phone from her ear and either placed it on or threw it across the kitchen counter.  (J. Watson Dep. 67:4–7; Pike Dep. 43:22–45:17; Gill Dep. 19:8–20.)  He told her that if she did not give him her license, he was going to arrest her. (J. Watson Dep. 70:7–12.)  When Ms. Tornetta asked what the license had to do with Mrs. Watson being outside raking leaves, Officer Pike stated something to the effect of, "[I]f you don't shut up, I'll take you in as well."  (Id. at 70:13–18; Pike Dep. 46:2–5.)

At that point, Officer Pike ordered Mrs. Watson to put her arms behind her back so he could handcuff her.  (Gill Dep. 19:21–24.)  Instead, she put her hands together in front of her body to prevent her wrists from being cuffed.  (Pike Dep. 46:21–47:3; Gill Dep. 21:17–19.) Officer Pike then grabbed her and proceeded to handcuff her by use of force with help from Officer Gill.  (J. Watson 70:20–22, 71:17–72:17; Gill Dep. 21:20–22:3; Pike Dep. 52:4–14.) Mrs. Watson purportedly told Officer Pike that he was hurting her, but he did not reply.  (J. Watson 74:16–24.)  She also asked to be allowed to put on her shoes and coat, and Officer Pike stated that she did not need shoes where she was going.  (J. Watson Dep. 75:7–76:9.)  The two officers then purportedly picked her up under her arms and either walked or dragged her down the whole length of the driveway to the police car.  (J. Watson Dep. 76:11–22; Pike Dep. 52:21–53:11; Gill Dep. 25:22–27:8.)  Mrs. Pili stated in her affidavit that she observed Mrs. Watson coming out of her house in handcuffs being escorted by two officers, that she was struggling and trying to get out of the handcuffs, and that she was wearing her shoes but no coat. (D. Pili Aff. ¶¶ 21–23.)  When they got to the rear door of the police car, Officer Pike told her to

6

get in.  (J. Watson Dep. 79:21–22.)  When she did not move, he screamed in her ear and then pushed her into the car.  (Id. at 80:1–82:15.)

Upon arrival at the police station, Mrs. Watson was escorted to a room and handcuffed to a bench.  (J. Watson Dep. 83:20–84:2.)  The police officers did fingerprints, took photographs, and asked her questions about her age, name, and date of birth.  (Id. at 84:3–85:7.)  Subsequently, she was escorted down a hallway to a jail cell.  (Id. at 85:15–86:12.)  Mrs. Watson indicated that she was in a lot of pain from a previous injury, yet she remained in this "freezing cold" jail cell with no shoes, minimal toilet paper, and a filthy toilet.  (Id. at 87:1–14.)  When she asked if she could have a drink and call her husband to bring her pain pills, she was refused.  (Id. at 87:19–88:2.)  During that time, Officer Pike consulted with Officer Gill and Sergeants Todd and Redding.  (Pike Dep. 59:2–16.)  Together, they decided to charge Mrs. Watson with resisting arrest, disorderly conduct, and interfering with lawful authority.  (Id. at 59:17–21; Defs.' Mot. Summ. J., Ex. 5.)

The following morning, Mrs. Watson was taken out of her jail cell and Officer Pike was assigned to take her to court for an arraignment.  (J. Watson Dep. 88:3–21; Pike Dep. 77:7–9.) She was given her shoes and coat, put in a car outside the jail cell, and driven to the courthouse. (J. Watson Dep. 88:24–90:11.)  She arrived at the courthouse in handcuffs and was taken into the building.  (Id. at 91:1–9.)  The district judge arraigned her, immediately after which time she collapsed.  (Id. at 91:12–92:23.)  Officer Pike called an ambulance, which took her to the hospital, where she was treated and released. (Pike Dep. 81:4–82:3; J. Watson Dep. 93:2–95:9.) Ultimately, the charges against her were dismissed.  (J. Watson Dep. 101:11–102:15.)

In December 2008, the Haverford Township Police conducted an internal administrative

investigation of the events surrounding Mrs. Watson's arrest and imprisonment.  (Pls.' Mot.

Summ. J., Ex. E.)  During interviews, several of Pike's superiors expressed their disapproval

with his handling of the situation.[2]  (Id.)

Plaintiffs commenced this action on November 17, 2010, against the Haverford Township

Police Department, the Township of Haverford, Chief of Police Carmen Pettine, Harvey Pike,

Steven Gill, John Pili, and John Does 1, 2, and 3.  In Plaintiffs' Amended Complaint, filed on

January 10, 2011, Plaintiff Janet Watson asserted (1) violations of 42 U.S.C. §§ 1983, 1985, and

1988, and her First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights against all

Defendants (Am. Compl. ¶¶ 75–83.); (2) assault and battery against Defendants Pike and Gill (id.

¶¶ 84–87); (3) false imprisonment and arrest against Defendants Pike, Gill, and Does 2 and 3 (id.

¶¶ 88–90); (4) intentional infliction of emotional distress against Defendants Pike, Gill, and Does

2 and 3 (id. ¶¶ 88–90); and (5) negligence against Defendants Pike, Gill, and Does 1 through 3.

(Id. ¶¶ 95–100.)  Plaintiff William Watson also asserted a claim for loss of assistance,

companionship, consortium, and society of his wife.  (Id.)  Plaintiffs voluntarily dismissed

Defendant Pettine from this action on February 3, 2011, and, on June 6, 2011, the Court denied

Defendant John Pili's Motion to Dismiss.

On April 4, 2012, both Plaintiffs and the Haverford Defendants filed Motions for

Summary Judgment.  The Responses were filed on April 24, 2012 and April 25, 2012.  The

_____

[2]  Defendants contend, with no explanation, that the opinions expressed at these
interviews do not constitute admissible evidence.  Absent some briefing or argument by the
parties, the Court cannot make a definitive ruling on this issue.  Nonetheless, it would seem to be
the case that hearsay opinions as to Officer Pike's handling of the incident made in hindsight by
others not present at the scene do not go to the issue of the reasonableness of Officer Pike's
belief that he had probable cause.

Haverford Defendants then submitted a Reply Brief on May 11, 2012, and Plaintiffs followed

with a Sur-reply Brief on May 16, 2012, making both Motions ripe for judicial review.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is

"material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to

return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence

that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv.

Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the

disputed evidence and decide which is more probative, or to make credibility determinations.

Boyle v. Cnty of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts.,

Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must

consider the evidence, and all reasonable inferences which may be drawn from it, in the light

most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg

Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the

evidence presented by both sides, the court must accept as true the allegations of the non-moving

party, and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

Although the moving party must establish an absence of a genuine issue of material fact,

9

it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325.  Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586.  "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322.  Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. Anderson, 477 U.S. at 249–50.

## III.   DISCUSSION

In the present matter, both parties move for summary judgment on Count I, while the Haverford Defendants seek summary judgment on the Complaint in its entirety.  For ease of discussion, the Court addresses several of Defendants' preliminary arguments and then discusses each of the substantive causes of actions.

### A.   Whether the John Doe Defendants Must Be Dismissed

The Haverford Defendants first seek dismissal of the John Doe Defendants, who have yet to be named in this case.  Federal Rule of Civil Procedure 21 provides that, "on motion or on its

own, the court may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21. "Use of John Doe defendants is permissible in certain situations until reasonable discovery permits the true defendants to be identified." Blakeslee v. Clinton Cnty., 336 F. App'x 248, 250 (3d Cir. 2009). "If reasonable discovery does not unveil the proper identities, however, the John Doe defendants must be dismissed." Id. Thus, at that juncture, "[i]t is appropriate, before proceeding to trial, to eliminate [the] fictitious defendants from [an] action under Fed. R. Civ. P. 21." Adams v. City of Camden, 461 F. Supp. 2d 263, 271 (D.N.J. 2006).

In the present case, Plaintiffs filed their Complaint on November 17, 2010, giving them well over a year to identify the John Doe Defendants and amend the Complaint to name them. Given the passage of a reasonable period of time and Plaintiffs' failure to attach an identity to any of these Defendants, the Court now dismisses the John Doe Defendants, and any causes of action against them, from this suit.[3]

### B.    Whether the Haverford Police Department Defendant Must Be Dismissed

Defendants next seek to dismiss the Haverford Police Department from this litigation. "In Section 1983 actions, police departments cannot be sued in conjunction with municipalities, because the police department is merely an administrative arm of the local municipality, and is not a separate judicial entity." DeBellis v. Kulp, 166 F. Supp. 2d 255, 264 (E.D. Pa. 2001). Thus, a police department "is not a 'person' subject to suit in a § 1983 civil rights action because it lacks an identity separate from the municipality of which it is a part." Draper v. Darby Twp. Police Dep't., 777 F. Supp. 2d 850, 856 (E.D. Pa. 2011); see also Martin v. Red Lion Police

---

[3]  In their Response to Defendants' Motion for Summary Judgment, Plaintiffs offer no challenge to the dismissal of the John Doe Defendants.  Accordingly, the Court deems this part of Defendants' Motion uncontested.

11

Dep't, 146 F. App'x 558, 562 n.3 (3d Cir. 2005) (dismissing police department from suit where municipality was also a defendant).

In the present action, Plaintiffs have sued both Haverford Township Police Department and Haverford Township itself.  Because the Police Department has no identity separate from the municipality of which it is a part, it is properly dismissed as a defendant in this action.[4]

C.     **Section 1983 Claims Against Officers Pike and Gill**

The next point of contention between the parties focuses on the viability of the civil rights claims against Officers Pike and Gill.  Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.  The statute itself does not independently create substantive rights, but rather merely "provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws." Kopec v. Tate, 361 F.3d 772, 775–76 (3d Cir. 2004); see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284–85 (2002); Bush v. Lancaster City Bureau of Police, No. Civ.A.07-3172, 2008 WL 3930290, at *3 (E.D. Pa. Aug. 26, 2008).  A plaintiff may bring a § 1983 action if he alleges that a person acting under color of state law deprived him of rights, privileges, or immunities secured by the Constitution or laws of the United States.  42 U.S.C. § 1983.  In other words, a plaintiff alleging a § 1983 violation must demonstrate that:  (1) the defendants acted under color of [state] law; and (2) their actions deprived [the plaintiff] of rights secured by the

---

[4]  Notably, Plaintiffs offer no response to this portion of Defendants' brief either.

12

Constitution or federal statutes.  Anderson v. Davila, 125 F.3d 148, 159 (3d Cir. 1997).

In the case at bar, Plaintiffs allege that Defendants Officers Pike and Gill, while acting under color of law and of their apparent authority, deprived Mrs. Watson of her rights, privileges and immunities granted to her as a citizen of the United States, violating, in particular, the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.  The present Motions by the parties focus solely on alleged violations of the Fourth Amendment.

The Fourth Amendment, made applicable to the States by the Fourteenth Amendment, Ker v. Calif., 374 U.S. 23, 30 (1963), provides in pertinent part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  U.S. Const., amend. IV.  In order to establish a claim under the Fourth Amendment, a plaintiff must show that the actions of the defendant: (1) constituted a "search" or  "seizure" within the meaning of the Fourth Amendment, and (2) were "unreasonable" in light of the surrounding circumstances.  Parker v. Wilson, No. Civ.A.98-3531, 2000 WL 709484, *3 (E.D. Pa. May 30, 2000) (citing Brower v. Cnty. of Inyo, 489 U.S. 593, 595 (1989)).  A seizure is a restraint of liberty by show of force or authority, see Florida v. Bostick, 501 U.S. 429, 434 (1991), and occurs "when a reasonable person in the position of the plaintiff would not feel free to decline a request of a government agent or to terminate an encounter with a government agent."  Brown v. Commonwealth, No. Civ.A.99-4901, 2000 WL 562743, *4 (E.D. Pa. May 8, 2000).

The Fourth Amendment contains prohibitions against several types of seizures.  First, it precludes a police officer from arresting and incarcerating a citizen except upon probable cause. See Groman v. Twp. of Manalapan, 47 F.3d 628, 636 (3d Cir. 1995) (stating that "an arrest based

on probable cause could not become the source of a [§ 1983] claim for false imprisonment"); Nimley v. Baerwald, No. Civ.A.02-7417, 2004 WL 117173, at *7 (E.D. Pa. May 26, 2004) (stating that, in a § 1983 action, the key element of a cause of action for unlawful arrest is that the law enforcement agent arrested the plaintiff without probable cause).  The Fourth Amendment also prohibits the use of unreasonably excessive force against an individual when making an arrest.  Graham v. Connor, 490 U.S. 386, 394 (1989).

In the present case, both parties move for summary judgment on the unlawful arrest aspect of Plaintiffs' 1983 claim, while just the Haverford Defendants move for summary judgment on the excessive force aspect of Plaintiffs' § 1983 claim.  The Court takes each claim individually.

### 1.   Unlawful Arrest

The primary dispute in this case turns on whether Officers Pike and Gill violated Mrs. Watson's clearly-established Fourth Amendment rights by arresting her without probable cause on the date in question.  The Court first considers whether Mrs. Watson's rights were, in fact, violated and then considers the Haverford Defendants' claims of protection under the qualified immunity doctrine.

### a.   Whether Officers Gill and Pike Arrested Janet Watson Without Probable Cause

The United States Supreme Court has characterized probable cause as a "fluid concept—turning on the assessment of probabilities in particular factual contexts— not readily, or even usefully, reduced to a neat set of legal rules."  Illinois v. Gates, 462 U.S. 213, 232 (1983). A showing of probable cause thus requires "proof of facts and circumstances that would

14

convince a reasonable, honest individual that the suspected person is guilty of a criminal offense." Lippay v. Christos, 996 F.2d 1490, 1502 (3d Cir. 1993). Although probable cause calls for more than mere suspicion, it does not mandate that the evidence at the time of the arrest be sufficient to prove guilt beyond a reasonable doubt. Nimley, 2004 WL 1171733, at *8 (citing Warlick v. Cross, 969 F.2d 303, 306 (7th Cir. 1992); Orsatti v. N.J. State Police, 71 F.3d 480, 482–83 (3d Cir. 1995)). Indeed, the ultimate finding of guilt or innocence, or even dismissal of charges arising out of an arrest and detention has no bearing on whether the arrest was valid. Pansy v. Preate, 870 F. Supp. 612, 617–18 (M.D. Pa. 1994) (citing Pierson v. Ray, 386 U.S. 547, 555 (1967)), aff'd, 61 F.3d 896 (3d Cir. 1995). Rather, "the proper inquiry is . . . whether the arresting officers had probable cause to believe the person arrested committed the offense." Moleski v. Ross, No. Civ.A.09-1111, 2010 WL 2766891, at *4 (E.D. Pa. July 12, 2010) (quotations omitted). The test is an objective one based on the facts available to the officers "at the moment of arrest," rather than in hindsight. Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994). Furthermore, whether the arresting officer acts in good faith or in bad faith in effectuating the arrest is irrelevant. Whren v. United States, 517 U.S. 806, 813–14 (1998). Notably, the existence of probable cause in a § 1983 action is generally a jury question. Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 788 (3d Cir. 2000). In appropriate cases, however, a court may conclude that probable cause existed as a matter of law if the evidence, viewed most favorably to the plaintiff, reasonably would not support a contrary factual finding. See Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997).

In the present matter, both parties move for summary judgment on the unlawful arrest Fourth Amendment claim. To properly analyze such a claim, the Court must consider the

elements of each crime with which Mrs. Watson was charged and determine if the Officers had probable cause to believe those elements were satisfied by her actions.  See Wright v. City of Phila., 409 F.3d 595, 602 (3d Cir. 2005) ("Whether any particular set of facts suggest that an arrest is justified by probable cause requires an examination of the elements of the crime[s] at issue.")  As noted above, Mrs. Watson was arrested for committing three crimes: (1) disorderly conduct; (2) interfering with lawful authority; and (3) resisting arrest.

Taking the facts of the present case in the light most favorable to Defendants, and crediting Officer Pike and Gill's version of the events,[5] the Court simply cannot find that the Officers had any semblance of probable cause to believe that Mrs. Watson had committed these or any other unidentified offenses.  Turning first to the disorderly conduct charge, the pertinent statute states:

**§ 5503. Disorderly conduct**

**(a) Offense defined.**—A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:
(1) engages in fighting or threatening, or in violent or tumultuous behavior;
(2) makes unreasonable noise;
(3) uses obscene language, or makes an obscene gesture; or
(4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

18 Pa. Cons. Stat. § 5503.  The Pennsylvania Supreme Court has held that "'[t]he cardinal feature of the crime of disorderly conduct is public unruliness which can or does lead to tumult and disorder.'"  Commonwealth v. Hock, 728 A.2d 943, 946 (Pa. 1999) (quoting Commonwealth v.

---

[5]  Notably, in doing so, the Court does not discredit Plaintiffs' version of the events, but simply disregards it for purposes of the present Motions.

Greene, 189 A.2d 141, 144 (Pa. 1963)).  "The crime of disorderly conduct is not intended as a

catchall for every act which annoys or disturbs people; it is not to be used as a dragnet for all the

irritations which breed in the ferment of a community."  Greene, 189 A.2d at 145.  Thus, even

assuming Mrs. Watson was blowing leaves onto her neighbor's property with a leaf-blower, such

actions do not rise to the level of (1) fighting, threatening, or violent/tumultuous behavior; (2)

unreasonable noise; (3) use of obscene language or gestures; or (4) creation of hazardous or

physically offensive conditions.  Moreover, although Mrs. Watson presumably continued to blow

leaves to avoid acknowledging Officer Pike, her activities, taken solely within the confines of the

front lawn of her home, do not fall within any of the aforementioned categories.  Finally, while

the Haverford Defendants argue that Mrs. Watson "loudly disput[ed]" Officer Pike's authority to

ask for identification, (Defs.' Mem. Supp. Mot. Summ. J. 15), causing the neighbors to come out

of their homes to see the disturbance, (Pike Dep. 23:4–21), Defendants point to no

evidence—and indeed do not suggest—that this conversation constituted unreasonable noise or

threatening/violent behavior within the confines of the statute and its interpretive jurisprudence.[6]

_____

[6]  As noted by the Pennsylvania Supreme Court:

> While noise may break tranquility, upset rest, destroy sleep and fracture serenity, it
> does not of itself break the public peace, an indispensable feature of the crime of
> disorderly conduct, when the traveling public is not disturbed.  If the production of
> noise alone made out the crime of disorderly conduct, then the coffers of the
> Commonwealth and municipalities entitled to monetary returns could be filled with
> fines assessed and collected from cheering football and baseball fans, riveting
> hammer operators, gong-clanging street car motormen, airplane pilots, siren-
> sounding ambulance drivers, missile testers, amusement park devotees, bathroom
> soloists, fife and drum players, trombone zealots, fireworks enthusiasts, etc.

Greene, 189 A.2d at 144.  Rather, unreasonable noise is that which is "not fitting or proper in
respect to the conventional standards of organized society or a legally constituted community."
Commonwealth v. Mastrangelo, 414 A.2d 54, 58 (Pa. 1980) (quoting Greene, 189 A.2d at 143).

Accordingly, the record clearly reflects that no probable cause existed to arrest Mrs. Watson for disorderly conduct.

With respect to the "Obstructing Administration of Law or Other Governmental Function" charge, the Haverford Defendants contend that Officer Pike informed Mrs. Watson that he was doing an official investigation and that she was doing everything in her power to interfere with that investigation. Specifically, Defendants claim that, when approached by Officer Pike on her front lawn, she loudly disputed his authority to request identification and denied that she had identification before eventually telling him that she would go inside her home and retrieve her license. (Id. at 15.) Thereafter, instead of simply returning from the house with her driver's license, she stayed inside and called a local government official to complain of improper questioning by local police. (Id.) When Officer Pike then entered her home—upon invitation from Ms. Tornetta—he again told her that once she produced identification, he would be on his way. (Id. at 16.) Instead, Mrs. Watson opted to call 9-1-1 to complain of police

---

There are four factors relevant to determining whether a person has engaged in disorderly conduct by making unreasonable noise: (1) the volume of the noise; (2) the duration of the noise; (3) the time of day; and (4) whether the noise was reported to the police. McNeil v. City of Easton, 694 F. Supp. 2d 375, 391 (E.D. Pa. 2010). Moreover, "[t]he mens rea requirement of this statute demands proof that appellant by his actions intentionally or recklessly created a risk or caused a public inconvenience, annoyance or alarm." Commonwealth v. Gilbert, 674 A.2d 284, 286 (Pa. Super. Ct. 1996).

In light of such principles, Defendants would be hard-pressed to argue that the use of the leaf blower and ensuing "loud" discussion between Mrs. Watson and Officer Pike constituted unreasonable noise such that she violated the disorderly conduct statute. The discussion occurred at 4:30 in the afternoon, did not last for an extensive period of time, and was not cause for any public alarm or additional calls to the police. Moreover, Defendants have cited no facts that would suggest to a reasonable officer that Mrs. Watson was acting to intentionally or recklessly cause a public inconvenience. Most importantly, Officer Pike's own report of the basis for the disorderly conduct charge cited only Mrs. Watson's actions of blowing leaves onto the Pilis' property, not to any unreasonable noise. (Defs.' Mot. Summ. J., Ex. 4.)

18

"harassment," which, according to Defendants, provided grounds for Officer Pike to believe that

Mrs. Watson was doing everything possible to interfere with his lawful investigation.

Again, taking the facts in the light most favorable to the Haverford Defendants, the Court

must disagree with Defendants' assessment of the case.  The pertinent statute states:

### § 5101. Obstructing Administration of Law or Other Governmental Function

A person commits a misdemeanor of the second degree if he intentionally obstructs, impairs or perverts the administration of law or other governmental function by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act, except that this section does not apply to flight by a person charged with crime, refusal to submit to arrest, failure to perform a legal duty other than an official duty, or any other means of avoiding compliance with law without affirmative interference with governmental functions.

18 Pa. Cons. Stat. § 5101.  The Pennsylvania Supreme Court has made clear that "[i]n order to

establish that [an individual] obstructed the administration of law under section 5101, the

Commonwealth must establish that: (1) the defendant had the intent to obstruct the

administration of law; and (2) the defendant *used force or violence, breached an official duty or*

*committed an unlawful act.*"  Commonwealth v. Goodman, 676 A.2d 234, 235 (Pa. 1996)

(emphasis added).  Absent this latter element, the crime has not been committed.  Id.  Nothing in

the record presented to this Court, however, indicates that Mrs. Watson used force or violence or

committed an unlawful act.  Similarly, Defendants have failed to point to—and this Court's

research does not uncover—any "official duty" or other obligation on the part of a citizen not

being held in a lawful traffic stop to produce identification upon request of police officer.[7]  As

---

[7]  The Supreme Court of the United States has expressly found that the Fourth Amendment does not prohibit a state from passing a law requiring the subject of an investigative detention to identify himself.  Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt Cnty., 542

such, the Court cannot find, under any version of the facts on record, that probable cause existed

to arrest Mrs. Watson for obstruction of the administration of law.

Finally, with respect to the resisting arrest offense, the Haverford Defendants argue that

Mrs. Watson "would not comply with Officer Pike's command to put her hands behind her back

so she could be handcuffed." (Defs.' Mem. Supp. Mot. Summ. J. 17.) "Instead she placed her

arms in front of her in order to avoid being handcuffed and began to scream at Officer Pike.

While she was resisting the officers' effort to place her in handcuffs, one of her hands came loose

and the handcuff swung around and hit Officer Pike."[8] (Id.) According to Defendants, such facts

are sufficient to create probable cause to believe that Mrs. Watson was resisting arrest.

Again, accepting this version of the facts, the Haverford Defendants disregard the actual

elements of the offense. Section 5104 states:

> **§ 5104. Resisting arrest or other law enforcement**
>
> A person commits a misdemeanor of the second degree if, with the intent of preventing a public servant from effecting a lawful arrest or discharging any other duty, the person creates a substantial risk of bodily injury to the public servant or anyone else, or employs means justifying or requiring substantial force to overcome the resistance.

18 Pa. Cons. Stat. § 5104. Notably, the statute requires the individual being charged to act with

---

U.S. 177, 185 (2004). Pennsylvania, however, does not have such a "stop and identify" statute. Indeed, the Pennsylvania Supreme Court has held that "[o]utside of a legitimate stop, police retain the right to ask people to identify themselves; if a mere encounter, however, people retain the right not to do so." Commonwealth v. Ickes, 873 A.2d 698, 701 (Pa. 2005). "[I]f one has the right to completely walk away, one has, *a fortiori,* the right to decline to answer questions. Refusing to provide the requested information is not criminal conduct." Id. at 701–02.

[8] Plaintiffs, of course, dispute this version of the facts. Mrs. Watson claims only that her hand slipped out of the handcuffs, causing them to swing.

"the intent of preventing a public servant from effecting *a lawful arrest* or discharging any other

duty." Id. (emphasis added).  Therefore, "[i]n order for a person to be guilty of resisting arrest,

there must first have been a *lawful* arrest."  Commonwealth v. Stevenson, 894 A.2d 759, 774 (Pa.

Super. Ct. 2006) (emphasis in original) (citing Commonwealth v. Biagini, 655 A.2d 492, 497

(Pa. 1995)).  As set forth in detail above, nothing in the facts suggests that Officers Pike and Gill

were effectuating a *lawful* arrest, especially given their lack of probable cause to believe she had

committed a crime.  To the extent she resisted such arrest, she was entitled to do so.

Officer Pike's statements made during his internal investigation interview bolster this

Court's analysis.  Officer Pike conceded that the blowing of leaves onto the neighbor's lawn was

a summary offense only, and he ultimately arrested Mrs. Watson due simply to her "persistent"

refusal to supply her identification.  (Pls.' Mot. Summ. J., Ex. E.)  He could not identify any legal

basis for requiring her to produce her identification.  Nor could he fit the facts of these

circumstances into any of statutes regarding disorderly conduct or obstruction of the

administration of the law.[9]  (Id.)

In short, viewing all evidence in the light most favorable to Defendants and accepting as

true Officer Pike's version of the events, the facts suggest only that Mrs. Watson was—as part of

an ongoing dispute with her neighbors—blowing leaves onto their property.  When Officer Pike

was summoned to the scene by the neighbor's phone call, Mrs. Watson ignored him and

_____

[9]  Plaintiffs also submit the internal investigation interviews of several supervisors within
the Haverford Township Police Department, wherein those supervisors criticized Officer Pike
and Gill's handling of the case.  As noted previously, however, such interviews are hearsay
statements that do not appear to fall into any one of the recognized exceptions.  Accordingly, the
Court will not consider them for purposes of these Motions.

continued to use her leaf blower.  She then questioned Officer Pike's request for her license or other form of identification, and subsequently retreated to her home, where she called governmental authorities for assistance in what she considered police harassment.  Officer Pike entered her home, demanded that she hang up the phone, and ultimately removed it from her hand.  He again asked her for identification and then proceeded to handcuff her when she refused to provide it.  When she resisted the handcuffing, he reacted with force and, with the assistance of Officer Gill, managed to secure and arrest her.  Nothing in this synopsis suggests that probable cause existed to arrest Mrs. Watson for any crime.  Accordingly, the Court finds that Mrs. Watson was subject to a § 1983 violation for unlawful arrest.

### b.      Whether Officers Pike and Gill Are Entitled to Qualified Immunity

In order to avoid the repercussions of the foregoing conclusions, Defendants seek protection under the doctrine of qualified immunity.  Qualified immunity provides that government officials are immune from suits for civil damages under 42 U.S.C. § 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Messerschmidt v. Millender, 132 S. Ct. 1235, 1244 (2012) (quotations omitted).  This doctrine attempts to balance the competing values of protecting innocent individuals from litigation while allowing liability for those who abuse their discretion.  Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982).  The qualified immunity analysis is specific to each individual defendant and considers the totality of the circumstances at the time of the defendant's challenged conduct.  Curley v. Klem, 499 F.3d 199, 207 (3d Cir. 2007).

The qualified immunity inquiry is a question of law consisting of two prongs to be

considered in any order.  Pearson v. Callahan, 555 U.S. 223, 232 (2009).  The first question is "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right."  Id. at 232 (internal citation omitted).  The second inquiry asks "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  Id.  A right is clearly established if "'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  Reedy v. Evanson, 615 F.3d 197, 224 (3d Cir. 2010) (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001), overruled in non-relevant part by Pearson, 555 U.S. 223 (2009)), cert. denied 131 S. Ct. 1571 (2011)).  "This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken."  Pearson, 555 U.S. at 244 (internal quotation marks omitted).  The court must consider "the information within the officer's possession at that time."  Harvey v. Plains Twp. Police Dep't, 421 F.3d 185, 194 (3d Cir. 2005) (citing Anderson v. Creighton, 483 U.S. 635 (1987)).

In the present case, the Court has already found that Mrs. Watson's constitutional rights were violated.  As such, our analysis focuses on the second qualified immunity inquiry of whether it should have been clear to a reasonable officer in Officers Pike and Gill's situation that their conduct was unlawful.  As stated in detail above, the law regarding unlawful arrest is well-established—the Officers must have had probable cause to believe that Mrs. Watson had committed a crime.  Nothing in the facts as presented by either Plaintiffs or the Haverford Defendants, however, would have suggested to a reasonable officer in those circumstances that Mrs. Watson was committing any such crime.  By Defendants' own admissions, the only wrongdoing occurring at the scene was Mrs. Watson's blowing of leaves onto her neighbor's

23

property, which is nothing more than a summary offense subject to only citation.  At no point did

Mrs. Watson engage in violence, use threatening or obscene language, create unreasonable

disturbances, suggest any intention to commit any more offenses, or take any action to suggest to

a reasonable officer that she was a threat to the public or anyone in particular.  The Officers'

actions are even more egregious in light of the facts that, at all times, Mrs. Watson was either on

her own property or inside her own home, and that she repeatedly sought to avoid further

confrontation with them.  Therefore, the Court declines to grant either Officer Pike or Gill

qualified immunity.

### c.  Conclusion as to Fourth Amendment Violation

In light of the foregoing, the Court is compelled to grant Plaintiffs' Motion for Summary

Judgment on Count I of the Complaint alleging a violation of 42 U.S.C. § 1983 based on Officer

Pike and Gill's unlawful arrest of Mrs. Watson.  By logical extension, Defendants have failed to

establish entitlement to summary judgment on this issue.  As such, the Court enters judgment in

Plaintiffs' favor on the § 1983 claim of unlawful arrest and denies the Haverford Defendants'

Motion for Summary Judgment on this ground.[10]

### 2.  Excessive Force

Plaintiffs' Complaint also includes a claim of excessive force in violation of the Fourth

Amendment also against Officers Gill and Pike.  Although Plaintiffs do not seek summary

judgment on this claim, the Haverford Defendants assert that they are entitled to qualified

immunity and request that this claim be dismissed under Federal Rule of Civil Procedure 56.  In

---

[10]  To the extent Plaintiffs claim that Mrs. Watson's incarceration was unlawful, this goes to damages and not liability.  Accordingly, the Court does not consider this argument at this time.

light of the current record, the Court declines to do so.

Beyond the prohibition on unlawful arrests, the Fourth Amendment further prohibits the use of unreasonably excessive force when making an arrest.  Graham v. Connor, 490 U.S. 386, 394 (1989).  The Supreme Court has stated that the "use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness."  Saucier, 533 U.S. at 202.  In making this determination, the court must evaluate the reasonableness of "a particular use of force . . . from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," while recognizing "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary."  Graham, 490 U.S. at 396–97.  As the United States Supreme Court has held:

> [T]he "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officer['s] actions are "objectively reasonable" in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation . . . .  An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

Id. at 397 (internal citations omitted).

Careful attention must be given to the facts and circumstances of each particular case, recognizing that the use of some coercion necessarily inheres in the officer's right to make such an investigatory stop or seizure.  Id. at 396.  These facts and circumstances include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Id. Our Court of Appeals has included additional factors for consideration, such as "the duration of

the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time."  Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997), abrogated on other grounds by Curley v. Klem, 499 F.3d 199 (3d Cir. 2007).

It is well-established that "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'"  Graham, 490 U.S. at 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).  "Generally, the force used must rise above the de minimis level in order for a constitutional claim to arise." Nardini v. Hackett, No. Civ.A.00-5038, 2001 WL 1175130, at *6 (E.D. Pa. Sept. 19, 2011). Several federal courts have granted summary judgment to defendants on Fourth Amendment § 1983 excessive force claims based upon a finding that the force applied by the defendant officers was de minimis.  See, e.g., Nolin v. Isbell, 207 F.3d 1253, 1258 (11th Cir. 2000) (noting that more than de minimis force is necessary to support a Fourth Amendment violation); Foster v. David, No. Civ.A.04-4829, 2006 WL 2371976, at *7 (E.D. Pa. Aug. 11, 2006) (pushing plaintiff out of a doorway to execute a valid search warrant was not excessive force); Garcia v. Cnty. of Bucks, 155 F. Supp. 2d 259, 264–65 (E.D. Pa. 2001) (dismissing Fourth Amendment excessive force claim upon finding that grabbing plaintiff's coat and arms and handcuffing him in the course of his arrest was a de minimis use of force, and therefore not a violation of the Fourth Amendment); Bensinger v. Mullen, No. Civ.A.99-1771, 2000 WL 1100781, at *2 (E.D. Pa. Aug. 4, 2000) (finding that where force used by police in effectuating arrest and injuries sustained by plaintiff therefrom were de minimis, the Fourth Amendment was not violated as a matter of law). Nonetheless, the minor degree of a plaintiff's injury, while relevant to the totality of the

26

circumstances, cannot on its own act as a complete defense to an excessive force claim.  Smith v. Mensinger, 293 F.3d 641, 649 (3d Cir. 2002); Herrera v. City of New Brunswick, No. Civ.A.08-3002, 2008 WL 305275, at *5 (D.N.J. Feb. 1, 2008).  Notably, the court should be careful to not conflate a false arrest violation with an excessive force violation.  Robinson v. Fetterman, 378 F. Supp. 2d 534, 544 (E.D. Pa. 2005) (citing Bodine v. Warwick, 72 F.3d 393, 400 & n.10 (3d Cir. 1995)).

Applying these considerations to the qualified immunity test in this case, the Court must initially determine if the facts alleged by Plaintiffs are sufficient, if believed, to show that Officers Pike and Gill used excessive force.  While Defendants assert that what occurred on the day in question was nothing more than de minimis force—*i.e.*, removing a phone from Mrs. Watson's hand, handcuffing her, and escorting her to the police car—the Court must construe the evidence in the light most favorable to Plaintiffs, the non-moving party.  According to Mrs. Watson's deposition, after Officer Pike entered her home, he grabbed the phone from her ear and threw it across the kitchen counter.  (J. Watson Dep. 67:4–7; Pike Dep. 43:22–45:17; Gill Dep. 19:8–20.)  At that point, Officer Pike ordered Mrs. Watson to put her arms behind her back and then grabbed her and proceeded to forcibly handcuff her with help from Officer Gill.  (J. Watson Dep. 70:20–22, 71:17–72:17.)  Officer Pike had her face down on the table and yanked her hands behind her back.  (Id. at 71:21-72:6.)  Mrs. Watson purportedly told Officer Pike that he was hurting her, but he did not reply.  (Id. at 74:16–24.)  Thereafter, the two officers then purportedly picked her up under her arms and dragged her down the whole length of the driveway to the police car—her feet barely touching the ground—without her shoes or coat.  (Id. at 76:11–22, 79:3–5.)  As they got to the rear door of the police car, Officer Pike told her to get in.  (Id. at

79:21–22.)  When she did not move, he screamed in her ear and then pushed her into the car.  (Id. at 80:1–82:15.)  Crediting this evidence, a jury could find that the Defendant Officers used considerable force in arresting Mrs. Watson.  Although the Haverford Defendants offer a much different version of the events, these factual determinations are for a jury, and not for a court on summary judgment.

This leaves the second step of the qualified immunity analysis—objective legal reasonableness.  Considering Plaintiffs' version of the events, the Court finds that it would be clear to a reasonable officer that Officers Pike and Gill's conduct was prohibited by the Fourth Amendment.  Guided by the factors set forth in the foregoing jurisprudence, the Court notes that Plaintiff Janet Watson was a slight, sixty-some year old woman doing nothing more than, according to Officer Pike, blowing leaves onto her neighbor's property.  Pike's attempts to confront and question Mrs. Watson were met, not with aggression or threats, by rather nothing more than a "loud" refusal to produce her identification and a retreat into her home.  When Pike next confronted her inside her house, she was on the phone with 9-1-1, at which point he took the phone out of her hand.  Thereafter, with no probable cause to believe she had committed *any* crime justifying the use of *any* force, Defendant Pike attempted to handcuff her.  When she did not cooperate, he forcibly pushed her onto a table with the help of another, fully-armed officer.  She made no threats, had no weapon, and was accompanied only by her eighty-year old mother.  The two officers then dragged her down to the car.  Ultimately, her pre-existing injuries were substantially exacerbated, such that she collapsed after her arraignment the following day.  To be clear, this Court recognizes that circumstances arise where police officers must make split-second decisions about the level of force required in a particular situation.  This, however, was

28

not such a case.  The law is clearly established that forcibly handcuffing and dragging a non-threatening sixty-year-old woman, who had committed no crime, constitutes an excessive use of force.

In sum, the Court concludes that the Haverford Defendants are not entitled to qualified immunity on the excessive force claim because the Officers, confronted with the circumstances in this case, could not have reasonably believed that their actions were lawful.  To the extent the precise facts regarding these events remain in dispute,[11] they must be submitted for jury consideration.  Accordingly, the Haverford Defendants' Motion for Summary Judgment as to the excessive force claim is denied.

### D.      Section 1983 Claims Against Haverford Township

The Haverford Defendants next seek summary judgment on the municipal liability claims against Defendant Haverford Township.  In the seminal case of Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), the United States Supreme Court confirmed that "Congress *did* intend municipalities and other local government units to be included among those persons to whom §1983 applies," but emphasized that, "a municipality cannot be held liable under § 1983 on a respondeat superior theory."  Id. at 690–91 (emphasis in original).  To establish section 1983 liability on such a governing body, the plaintiff must identify either a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or "constitutional deprivations visited pursuant to governmental 'custom' even though such a

_____

[11]  The Court again acknowledges that Defendants present a very different version of the facts, which, if true, would negate a finding of excessive force.  For purposes of summary judgment only, however, the Court must disregard this version.

custom has not received formal approval through the body's official decision making channels."
Id.  A policy is shown when "a 'decisionmaker possessing final authority to establish municipal
policy with respect to the action' issues an official proclamation, policy, or edict."  Beck v. City
of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (quoting Andrews v. City of Phila., 895 F.2d
1469, 1480 (3d Cir. 1990)).  A custom is defined as "'such practices of state officials so
permanent and well-settled as to constitute law,'" which can be established by showing the
policy maker's knowledge and acquiescence to the custom.  Id. (quoting Andrews, 895 F.2d at
1480).  Alternatively, a custom or policy may be established from a failure to train, supervise, or
otherwise act, where that failure reflects a deliberate indifference of officials to the rights of
persons that come into contact with these municipal employees.  City of Canton v. Harris, 489
U.S. 378, 388 (1989); Reitz v. Cnty. of Bucks, 125 F.3d 139, 145 (3d Cir. 1997).  As succinctly
summarized by the Third Circuit, three situations exist where acts of a government employee are
deemed to be the result of a policy or custom of the governmental employer, thereby rendering
the entity liable under § 1983:

> The first is where the appropriate officer or entity promulgates a generally applicable
> statement of policy and the subsequent act complained of is simply an
> implementation of that policy. . . .  The second occurs where no rule has been
> announced as policy but federal law has been violated by an act of the policymaker
> itself. . . .  Finally, a policy or custom may also exist where the policymaker has
> failed to act affirmatively at all, though the need to take some action to control the
> agents of the government is so obvious, and the inadequacy of existing practice so
> likely to result in the violation of constitutional rights, that the policymaker can
> reasonably be said to have been deliberately indifferent to the need.

Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (internal quotation
marks and citations omitted).

Beyond identification of a policy or customary failure to act, establishment of section

1983 municipal liability requires a showing of causation.  "[I]t is not enough for a §1983 plaintiff merely to identify conduct properly attributable to the municipality."  Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 404 (1997).  Rather, the plaintiff "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  Id.; see also Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (plaintiff carries burden of demonstrating a "plausible nexus" or "affirmative link" between the municipality's custom or policy and the constitutional deprivation challenged).  The standard of causation is stringent and requires that "the identified deficiency . . . be closely related to the ultimate injury."  Canton, 489 U.S. at 391.

The Haverford Defendants now argue that any possible Monell claim fails because Plaintiffs have neither identified a policy or customary failure to act, nor established causation between that municipal action/policy and the deprivation of constitutional rights.  In response, Plaintiffs make no effort to indicate what custom or policy resulted in the constitutional violation.  Indeed, Plaintiffs' Opposition brief fails to even acknowledge the Monell claim or the Haverford Defendant's Motion for Summary Judgment on it.  As such, the Court's only indication as to the parameters of this claim comes from the Amended Complaint, which alleges that Haverford Township failed to train, supervise, discipline, or control its officers.  (Am. Compl. ¶¶ 79–80.)  Such a bare allegation, in the absence of any evidence to support it, simply cannot survive summary judgment scrutiny.  Accordingly, the Court grants the Haverford Defendants' Motion on this claim.

E.      **Section 1985 Claim**

The next target of the Haverford Defendants' Motion for Summary Judgment is

Plaintiffs' claim under 42 U.S.C. § 1985.  Section 1985(c) states:

> If two or more persons in any State or Territory conspire . . ., for the purpose of
> depriving, either directly or indirectly, any person or class of persons of the equal
> protection of the laws, or of the equal privileges and immunities under the laws . . .;
> in any case of conspiracy set forth in this section, if one or more persons engaged
> therein do, or cause to be done, any act in furtherance of the object of such
> conspiracy, whereby another is injured in his person or property, or deprived of
> having or exercising any right or privilege of a citizen of the United States, the party
> so injured or deprived may have an action for the recovery of damages occasioned
> by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(c).  The Third Circuit has explained that in order to state a cause of action

under § 1985, a plaintiff must prove the following elements: (1) a conspiracy; (2) motivated by a

racial or class-based discriminatory animus designed to deprive directly or indirectly, any person

or class of persons of the equal protection of the laws; (3) an act in furtherance of the conspiracy;

and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of

the United States.  Lake v. Arnold, 112 F.3d 682, 685 (3d Cir. 1997).  Notably, this section is

"limited to conspiracies based on racial or some other class based invidiously discriminatory

animus."  Sarteschi v. Pennsylvania, No. Civ.A.06-2332, 2007 WL 1217858, at *2 (M.D. Pa.

Apr. 24, 2007).

Plaintiffs' Amended Complaint fails to set forth even the semblance of the elements of a

conspiracy under section 1985.  Faced with a Motion for Summary Judgment, and with discovery

now closed, Plaintiffs now fail to any evidence that would suggest the existence of any such

conspiracy or that such conspiracy was motivated by a racial or class-based discriminatory

animus.  Therefore, the Court grants the Haverford Defendants' Motion for Summary Judgment on this claim.

### F.      State Law Claims

In conjunction with their federal civil rights claims, Plaintiffs also bring a series of claims under Pennsylvania state law.  The Haverford Defendants seek a summary judgment ruling on all of these causes of action, which the Court now considers individually.

### 1.      Assault and Battery

"To prove [a] claim of assault, under Pennsylvania law, [p]laintiff must show that a particular [d]efendant intentionally caused an imminent apprehension of a harmful or offensive bodily contact in [p]laintiff."  Lakits v. York, 258 F. Supp. 2d 401, 407 (E.D. Pa. 2003) (citations omitted).  In other words, "[a]n assault is an intentional attempt by force to do an injury to the person of another."  Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994) (quoting Cohen v. Lit Bros., 70 A.2d 419, 421 (Pa. Super. Ct. 1950)).  "To prove [a] claim of battery, [a] [p]laintiff must establish that a particular [d]efendant intended to cause a harmful or offensive contact to [p]laintiff, or an imminent apprehension of such contact in [p]laintiff, and that such contact with [p]laintiff resulted."  Lakits, 258 F. Supp. 2d at 407.  "[A] battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person."  Renk, 641 A.2d at 293 (quoting Cohen, 70 A.2d at 421).  In Pennsylvania, law enforcement officers are privileged to use a reasonable amount of force in effectuating an arrest or preventing interference with his duties.   Id.  "The reasonableness of the force used in making the arrest determines whether the police officer's conduct constitutes an assault and battery."  Id.

In support of their efforts to have these claims dismissed, the Haverford Defendants offer the same arguments offered in support of their Motion for Summary Judgment on the excessive force claim.  As set forth in the discussion of that claim, however, the facts remain disputed as to what occurred on the day in question.  Taking the facts in the light most favorable to Plaintiffs, a reasonable jury could find that Officers Pike and Gill intended to cause a harmful or offensive contact to Mrs. Watson and did, in fact, cause such harmful or offensive contact.  Thus, the Haverford Defendants' Motion on these claims is denied.

### 2.    False Imprisonment/False Arrest

"[F]alse arrest and false imprisonment are essentially the same claim."  Olender v. Twp. of Bensalem, 32 F. Supp. 2d 775, 791 (E.D. Pa.) (citing Pennsylvania cases), aff'd, 202 F.3d 254 (3d Cir. 1999).  There are two elements to a claim of false imprisonment under Pennsylvania law: "(1) the detention of another person, and (2) the unlawfulness of such detention."  Renk, 641 A.2d at 293.  In Pennsylvania, a false arrest is defined as "1) an arrest made without probable cause or 2) an arrest made by a person without privilege to do so."  Russoli v. Salisbury Twp., 126 F. Supp. 2d 821, 869 (E.D. Pa. 2000).  False arrest and false imprisonment claims against police officers effectively turn on whether probable cause exists.  Id. at 869–70.  Indeed, "Pennsylvania state law false arrest claims and federal constitutional false arrest claims are co-extensive as to both elements of proof and elements of damages."  Id. at 869.

In the present case, the Court has already found that Officers Pike and Gill did not have probable cause to either arrest or imprison Plaintiff.  As such, the Haverford Defendants are not entitled to summary judgment on these co-extensive state law-based causes of action.

### 3.     Intentional Infliction of Emotional Distress

Count IV of the Amended Complaint alleges that Defendants Pike and Gill "formed an agreement to harass Plaintiff and willfully carried out that agreement by acting in an extreme and outrageous manner toward Plaintiff, Janet Watson."  (Am. Compl. ¶ 92.)  The Haverford Defendants now seek summary judgment on this cause of action.

Pennsylvania courts recognize the tort of intentional infliction of emotional distress, but have been cautious in permitting recovery under this theory.  Williams v. Guzzardi, 875 F.2d 46, 52 (3d Cir. 1989).  To state a claim for intentional infliction of emotional distress under Pennsylvania law, a plaintiff must allege that (1) the defendant engaged in extreme and outrageous conduct; (2) the conduct caused the plaintiff severe emotional distress; and (3) the defendant acted intending to cause such distress or with knowledge that such distress was substantially certain to occur.  Brown v. Muhlenberg Twp., 269 F.3d 205, 218 (3d Cir. 2001).  Courts have defined "extreme and outrageous" quite narrowly, finding that the conduct must "go beyond all possible bounds of decency, and [ ] be regarded as atrocious, and utterly intolerable in a civilized community."  Salerno v. Phila. Newspapers, Inc., 546 A.2d 1168, 1172 (Pa. Super. Ct. 1988) (citations and internal quotations omitted).  Moreover, "in order to recover on a claim of intentional infliction of emotional distress, the plaintiff must prove the existence of the alleged emotional distress by competent medical evidence." Robinson v. May Dept. Stores Co., 246 F. Supp. 2d 440, 444 (E.D. Pa. 2003) (internal quotations omitted).  Ultimately, intentional infliction of emotional distress in Pennsylvania is a "tort reserved for the most extreme ranges of behavior."  Halterman v. Tullytown Borough, No. Civ.A.10-7166, 2011 WL 2411020 at *7 (E.D. Pa. June 14, 2011).

At this summary judgment stage of litigation, with discovery now closed, Plaintiffs have failed to produce any expert medical confirmation of Mrs. Watson's alleged emotional distress. Indeed, despite the Haverford Defendants raising this issue in their Motion for Summary Judgment, Plaintiffs have completely ignored it and have made no effort to justify this claim's continued presence in this case.  Accordingly, the Court will grant summary judgment in favor of Defendants on Count IV of the Amended Complaint.

### 4.   <u>Negligence</u>

Count V of the First Amended Complaint alleges "negligence" against Officers Pike and Gill, as well as the now-dismissed John Doe Defendants, claiming that they "had a duty to provide medical care" to Mrs. Watson following her injuries during the course of the arrest, but failed to do so.  (Am. Compl. ¶¶ 96–99.)  As a result, Mrs. Watson asserts that she suffered "aggravated physical injuries," "inhumane treatment," and "emotional distress."  (<u>Id.</u> ¶ 100.)

The elements of negligence include: a legal duty, a breach of that duty, a causal relationship between the defendant's negligence and the plaintiff's injuries, and damages.  <u>Martin v. Evans</u>, 711 A.2d 458, 461 (Pa. 1998).  The Haverford Defendants contend that the record is devoid of evidence showing that either Officer Pike or Gill had any contact with Mrs. Watson on the evening of her arrest after she was brought to the police station or that either Officer should have been aware that she needed medical attention.  Moreover, although the record shows that Officer Pike was responsible for driving Mrs. Watson to court the following morning, there is no evidence that Mrs. Watson ever conveyed to him any need for medical care.  Indeed, both parties concede that when Mrs. Watson collapsed after her arraignment, it was Officer Pike that called the ambulance.

36

In response, Plaintiffs again fail to acknowledge the Haverford Defendants' Motion on this Count, and fail to point to any evidence to support their claim.  Accordingly, the Court enters judgment in favor of the Haverford Defendants on Plaintiffs' cause of action for negligence.[12]

### 5.    Loss of Consortium

Under Pennsylvania's common law, a loss of consortium claim is intended to compensate one for the "'loss of the services, society, and conjugal affection of one's spouse.'"  Smalls v. Pittsburgh-Corning Corp., 843 A.2d 410, 417 (Pa. Super. Ct. 2004) (quoting Anchorstar v. Mack Trucks, Inc., 620 A.2d 1120 (Pa. 1993)); see also Adam C. v. Scranton Sch. Dist., No. Civ.A.07-532, 2011 WL 996171, at *7 (M.D. Pa. Mar. 7, 2011).  Notably, "the validity of a loss of consortium claim is derivative of the validity of the injured spouse's claim." Jensen v. United States, No. Civ.A.09-2977, 2009 WL 4117357, at *3 (E.D. Pa. Nov. 24, 2009).

Given that Plaintiff Janet Watson can clearly recover on her § 1983 claim, and given that several other of her state law claims survive summary judgment, it is entirely premature to dismiss Plaintiff William Watson's derivative loss of consortium claim.  Therefore, this portion of the Haverford Defendants' Motion is denied.

### G.    Punitive Damages

Finally, the Haverford Defendants seeks summary judgment on Plaintiffs' punitive damages claim.  In particular, they argue that "the evidence on record fails to meet the standard

---

[12]  The Haverford Defendants also claim immunity under Pennsylvania's Political Subdivision Tort Claims Act, 42 Pa. C.S. § 8541, et seq.  Because the Court finds that no genuine issue of material fact as to the viability of the negligence claim remains, there is no need to address the immunity issue.

under Pennsylvania law for an award of punitive damages, *i.e.*, that Haverford Police

Defendants' actions were 'malicious, willful, oppressive, or exhibited reckless indifference to the

rights of others.'" (Defs.' Mem. Supp. Mot. Summ. J. 27.)

Punitive damages, however, are available against individual state actors in a § 1983 case

upon a showing that their conduct was "'motivated by evil motive or intent, or when it involves

reckless or callous indifference to the federally protected rights of others.'" Russoli v. Salisbury

Twp., 126 F. Supp. 2d 821, 873–74 (E.D. Pa. 2000) (quoting Smith v. Wade, 461 U.S. 30, 56

(1983)); see also Keenan v. City of Phila., 983 F.2d 459, 469–70 (3d Cir. 1992).  "The purpose of

punitive damages is to punish the defendant for his willful or malicious conduct and to deter

others from similar behavior."  Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 306 n.9

(1986).  Similarly, "[t]he legal standard for punitive damages for state law claims is a matter of

state law."  See Griffiths v. CIGNA Corp., 857 F. Supp. 399, 409–10 (E.D. Pa. 1994), aff'd, 60

F.3d 814 (3d Cir. 1995).  The Supreme Court of Pennsylvania has adopted the Restatement

(Second) of Torts, § 908(2), which permits punitive damages for "conduct that is outrageous,

because of the defendant's evil motive or his reckless indifference to the rights of others."  Rizzo

v. Haines, 555 A.2d 58, 69 (Pa. 1989) (quoting Rest. (2d) Torts § 908(2)). "A court may award

punitive damages only if the conduct was malicious, wanton, reckless, willful, or oppressive."

Id. (citing Chambers v. Montgomery, 192 A.2d 355, 358 (Pa. 1963)).

The Court has already found a lack of probable cause for Mrs. Watson's arrest.

Moreover, Plaintiffs' claims for assault and battery, false imprisonment, and excessive force

remain.  Should Plaintiffs be able to prove at trial that the Officers' actions underlying these

claims rose to the level of willful or malicious conduct, Plaintiffs will be entitled to punitive

damages.  Accordingly, the Court declines to dismiss this claim.

**IV.     CONCLUSION**

In light of the foregoing, the Court finds that summary judgment is warranted in part, but not on the entirety of this matter.  With respect to Plaintiffs' § 1983 unlawful arrest claim, the facts, viewed entirely from the Haverford Defendants' perspective, clearly show that no probable cause existed for Janet Watson's arrest.  Accordingly, summary judgment is entered in Plaintiffs' favor on this claim.  As to the Haverford Defendants' Motion for Summary Judgment on the remaining counts of this case, the Court agrees that (1) the John Doe Defendants must be dismissed; (2) the Haverford Township Police Department must be dismissed as duplicative of the naming of Haverford Township; (3) the § 1983 claims against Haverford Township Defendant are meritless; (4) Plaintiffs have set forth no evidence in support of their § 1985 claims; (5) and Plaintiffs' state law claims of intentional infliction of emotional distress and negligence fail to survive summary judgment scrutiny.  Accordingly, the Haverford Defendants' Motion is granted with respect to these claims.  As to the Haverford Defendants' Motion for Summary Judgment on Plaintiffs' excessive force, assault and battery, false arrest/false imprisonment, and loss of consortium claims, as well as as Plaintiffs' request for punitive damages, the Court finds that too many genuine issues of material fact prevail on these issues, thereby precluding a grant of summary judgment.